**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION,<br><br>                      Plaintiff,<br><br>  v.<br><br>BUCA, INC.<br><br>                      Defendant. | CIVIL ACTION<br>FILE NO. |

## COMPLAINT

Plaintiff, United States Securities and Exchange Commission ("Commission"), alleges as follows:

## NATURE OF THE ACTION

1. This matter concerns violations of the antifraud and other provisions of the federal securities laws by Buca, Inc. ("Buca"), a publicly traded, Minneapolis-based restaurant company. From 2000 to 2004, Buca filed with the Commission proxy statements and Forms 10-K that materially understated the compensation of its top two officers, omitted significant related party transactions involving the company's CEO and CFO, and reported inflated income due to an earnings management scheme orchestrated by Buca's CFO and Controller.

2. Specifically, Buca failed to disclose in its proxy statements and Forms 10-K for 2000 to 2003 that its former CEO and Chairman of the Board, Joseph P. Micatrotto, Sr. ("Micatrotto") improperly obtained reimbursement from Buca for personal expenses totaling nearly $850,000 and Buca's former CFO, Greg A Gadel ("Gadel") improperly obtained

reimbursement of more than $111,000 for vacations and visits to strip clubs and other personal expenses.  Buca also reported inflated pre-tax income from 2000 to 2004 in amounts ranging from 18.8% to 36.9% due to a scheme orchestrated by Gadel and Buca's former controller, Daniel J. Skrypek ("Skrypek") to meet earnings targets through improperly capitalizing approximately $11.9 million in expenses.  Finally Buca failed to disclose in its Forms 10-K for 2000 and 2001 that Micatrotto and Gadel participated in various related party transactions.

3. As a result, Defendant Buca, directly and indirectly, has engaged, and unless enjoined, will continue to engage in transactions, practices, and courses of business which constitute violations of Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)]; Sections 10(b), 13(a), 13(b)(2)(A), 13(b)(2)(B), and 14(a) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78j(b), 78m(a), 78m(b)(2)(A), 78m(b)(2)(B), and 78n(a)] and Rules 10b-5, 12b-20, 13a-1, 13a-13, 14a-3, and 14a-9 thereunder [ 17 C.F.R. §§ 240.10b-5,  17 C.F.R. 240.12b-20, 17 C.F.R.240.13a-1, 17 C.F.R.240.13a-13, 17 C.F.R. 240.14a-3, and 17 C.F.R. 240.14a-9].

## JURISDICTION AND VENUE

4. The Court has jurisdiction over this action pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Sections 21(d) and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78aa].

5. Venue is proper in this Court pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. §78aa].

## THE DEFENDANT

6. Buca is a publicly-traded company incorporated in Minnesota in 1994 and headquartered in Minneapolis.  Buca is the holding company for the Italian-themed restaurant

chain Buca di Beppo. Buca conducted an initial public offering of its stock in 1999. Since then, Buca's stock has been traded on NASDAQ. As a public company, Buca is required to file certain documents with the Commission, including annual reports on Forms 10-K, quarterly reports on Forms 10-Q, and proxy statements. From 2000 through 2004, Buca also filed with the Commission several S-8 registration statements in connection with offerings of its securities. These registration statements incorporated by reference Buca's financial statements and certain other Commission filings.

## FACTS

### Buca Understated Executives' Compensation And Abuses Of Its Expense Reimbursement System

7.  Between at least 2000 and 2003, Buca had few policies or controls for reimbursement of travel and entertainment expenses of its employees and officers. In order to obtain reimbursement from Buca, an officer simply needed another officer to sign off on a reimbursement request. Accounting personnel regularly received and approved officers' requests for reimbursement of personal expenses regardless of whether the officers attached supporting documentation for the expenses. Several officers regularly billed Buca for a wide variety of personal expenses, including family vacations. Reimbursement of such expenses was approved by other employees and officers.

8.  Micatrotto and Gadel took advantage of Buca's lax expense reimbursement system, and received a combined total of almost $1 million in improper reimbursements from Buca.

9.  Buca reimbursed Micatrotto $849,100 for unsupported, duplicate, or personal expenses from 2000 to 2003. These personal expenses included: almost $127,000 in duplicate airline tickets; nearly $131,000 in ATM cash withdrawals; $152,996 in unauthorized "housing

3

allowance" payments; airfare to Hawaii for his son's wedding; the bill for the groom's dinner for his son's wedding; dog kenneling; car washes; gifts for his wife; and home remodeling costs.

10.     Buca reimbursed Gadel for at least $111,631.29 of improper personal expenses from 2001 to 2003.  These personal expenses included visits to strip clubs, family vacations, an excessive car allowance, gasoline, and meals.

11.     Buca's proxy statements and Forms 10-K for the years 2000 through 2003 materially understated Micatrotto's compensation by excluding a large amount of perquisites that he received through the company.  The difference between Micatrotto's reported compensation and actual compensation for those years is summarized below:

| Micatrotto's Compensation | Year | | | |
| --- | --- | --- | --- | --- |
| | 2000 (as reported in 2003) | 2001 (as reported in 2004) | 2002 (as reported in 2004) | 2003 (as reported in 2004) |
| Compensation, As Reported | 327,828 | 378,985 | 691,211 | 699,090 |
| Actual Compensation | 447,828 | 658,485 | 948,911 | 890,990 |
| Impact of Unreported Compensation as a Percentage of Reported Compensation | 37% | 74% | 37% | 27% |

The only perquisites that Buca disclosed it paid to Micatrotto during these years included a housing and car allowance, the value of insurance the company paid on Micatrotto's behalf, and a $150,000 loan to Micatrotto that the company forgave in 2002.  Buca did not disclose in its filings with the Commission any of the $849,100 in personal expenses that Micatrotto improperly billed to Buca.

12.     Likewise, Buca materially understated Gadel's compensation in its Forms 10-K and proxy statements for the years 2001 to 2003.  Buca reported that Gadel received compensation of $177,996 in 2001, $258,990 in 2002, and $278,865 in 2003.  Yet Gadel

4

received additional undisclosed perquisites of $38,029 in 2001, $30,000 in 2002 and $43,601 in 2003. Accordingly, Buca understated Gadel's compensation by 21.4% in 2001, 11.5% in 2002, and 15.6% in 2003.

**Buca Failed To Disclose That Its Officers Engaged In Related Party Transactions**

13. In December 2001, Micatrotto used Buca's funds to purchase a villa in Sermenino, Italy for himself and one of Buca's wine vendors. To obtain reimbursement from Buca, Micatrotto submitted a series of check requests to Buca reflecting the property's purchase price of approximately $167,000. Skrypek and Gadel approved the check requests and Buca reimbursed Micatrotto and the vendor for the purchase. Thereafter, Micatrotto ordered extensive renovations to the villa, and obtained reimbursement from Buca for renovation expenses totaling approximately $45,000.

14. Micatrotto failed to identify the purchase and renovation of the villa in any of his proxy questionnaires, even though the questionnaires requested disclosure of all related party transactions involving an amount greater than $60,000. As a result, Buca failed to disclose Micatrotto's villa purchase in its proxy statements, financial statements and Forms 10-K for 2001 and 2002.

15. After Buca's audit committee learned the details concerning Micatrotto's purchase and renovation of the villa, it required Micatrotto to unwind the transaction. In January 2004, the Board requested that Micatrotto and his wife sign an agreement assigning ownership of the property to Buca. Micatrotto transferred title of the villa into Buca's name in March 2004.

16. Micatrotto also obtained $65,000 in cash through a fraud on Buca. In 2003, Micatrotto incurred a debt of approximately $63,000 after a restaurant in which he invested (unrelated to Buca) ceased operations. Gadel and Buca's former Chief Information Officer, at

Micatrotto's request, asked one of Buca's vendors to pay Micatrotto $65,000, with the understanding that the vendor could submit an inflated invoice to Buca to cover the amount it paid Micatrotto. The vendor thus billed Buca for $65,000 of services it did not perform and, after it received payment from Buca, the vendor wrote a check to Micatrotto for $65,000. Although this transaction represents a related party transaction that Buca was required to disclose in its proxy statements and financial statements, Buca never reported this payment as a related party transaction in its financial statements or in its proxy statement for 2003.

17. Buca also engaged in related party transactions in 2000 and 2001 with an information technology company, High Wire Networks, Inc. ("High Wire"), which was established in October 2000 by a group that included Gadel and Buca's former Chief Information Officer. The group that formed this company also included two of the primary owners of one of Buca's major information technology vendors. High Wire provided voice-over internet protocol primarily to companies other than Buca. High Wire ceased operations in late 2001. During the relevant time period, Gadel and Buca's former Chief Information Officer were directors of High Wire and owned 10% and 20% of High Wire's equity, respectively. They also were authorized signatories on High Wire's checking account and served as High Wire's contacts with Buca.

18. Although High Wire provided its services primarily to companies other than Buca, Buca essentially funded High Wire's operations. High Wire had offices in a portion of Buca's office complex and Buca paid nearly $98,000 to build out the office space occupied by High Wire. Further, Buca paid the information technology vendor more than $1 million to fund the salaries of High Wire's employees. Buca never disclosed its transactions with High Wire as related party transactions in its financial statements or in its Forms 10-K for the years 2000 and 2001.

6

**Buca Engaged In A Financial Fraud**

19.     Buca engaged in a financial fraud involving improper capitalization of expenses that caused it to restate its financial statements for its fiscal years from 2000 to 2003 and for the first three quarters of fiscal 2004.  In its 2004 10-K, filed on July 25, 2005, Buca disclosed that, because of the improper capitalization, it had overstated the amount of its pre-tax income by approximately $11.9 million for fiscal years 2000 through 2003 and the first three quarters of fiscal 2004.  The improper capitalization inflated Buca's reported pre-tax annual income from 2000 to 2003 in amounts ranging from 18.8% to 36.9%.

20.     The fraudulent scheme involved taking ordinary expenses (which should be expensed in the period in which they are incurred) and treating them as capital expenditures (which may be expensed or depreciated over time) in order to meet analyst earnings estimates. Beginning in 2000, Gadel and Skrypek preliminarily assessed Buca's financials at the close of each quarter and then determined how much income they needed to find in order to meet analysts' earnings estimates for Buca.  Gadel and Skrypek found a number of different ways to inflate Buca's income by decreasing expenses through improper capitalization.

Sham Donations From Vendors Billed Back To The Company

21.     Buca improperly capitalized approximately $713,000 in expenses incurred in connection with an elaborate bill-back arrangement with certain vendors.  The bill-back scheme concerned an annual conference for Buca store managers called the "Paisano Partners Conference."  Buca ostensibly funded the Paisano Partners Conference through contributions from its vendors.  In reality, certain Buca vendors made contributions to the conference with the understanding that they could bill back the contribution to Buca.  These vendors paid contributions to Buca for the Paisano Partners Conferences and then billed back the amount of

the contribution by adding it to a subsequent inflated invoice to Buca. Buca's accounting personnel, in turn, characterized the inflated invoices as capital expenditures. As a result, Buca effectively capitalized the expense of the conference.

### Everyday Repairs And Maintenance

22.     Buca improperly capitalized approximately $4.67 million in repair and maintenance expenses, as well as general and administrative expenses. Repair and maintenance expenses were targeted as a way to make up the difference between analyst earnings estimates and Buca's preliminary financial results. Buca's assistant controller was directed at the end of each quarter to review repair and maintenance account invoices over $1,000 to find invoices that could be capitalized in a sufficient quantity to meet an earnings target. At first, Buca employed a practice of capitalizing most repair and maintenance invoices over $1,000 so that there was no need to review invoices at quarter end for capitalization purposes. Second, near the end of 2001, Buca set up a capitalization account for invoices under $1,000. Over time, Buca's accounting employees began to put any repair or maintenance invoices that the company received into this account, regardless of whether the invoice represented a capital expense.

### Invoices From Vendors Related To Buca

23.     In addition to the undisclosed related party transactions with High Wire discussed above, Buca, through Gadel and Skrypek, improperly capitalized approximately $1.5 million worth of invoices submitted as part of the arrangement involving High Wire and the information technology vendor. First, the information technology vendor billed Buca for salary payments totaling $1,394,775 made to High Wire employees, even though many of these High Wire employees spent little or no time working for Buca. Buca's accounting personnel capitalized these salary payments despite having no documentation that supported this accounting treatment.

Second, Buca used an inflated invoice from the technology vendor to improperly capitalize approximately $130,000 of ordinary expenses, including Buca's monthly telephone bill. Finally, High Wire submitted invoices to Buca for $100,000 with no description of the goods or services provided. Buca capitalized the payments on these invoices.

Payments To Independent Contractors

24.     Buca improperly capitalized approximately $1 million in payments to independent contractors. The improperly capitalized payments involved both mischaracterizing certain Buca employees as independent contractors and mischaracterizing the work of genuine independent contractors as capital expenses.

25.     Buca improperly characterized certain employees as independent contractors so that it could capitalize payments to them. In 2002, Skrypek told Buca's new assistant controller that he would be an independent contractor for the first three months of his employment. Since Buca was in the process of acquiring another restaurant chain at this time, Buca capitalized salary payments to the assistant controller as part of this acquisition.

26.     In another example, Buca laid off its Vice President of Real Estate, then immediately re-hired her as an independent contractor. Buca then paid her a $100,000 "finder's fee" for two leases she had previously negotiated, which allowed Buca to effectively capitalize her severance payments.

27.     Buca's accounting personnel also mischaracterized the invoices of genuine independent contractors as capital expenses. For example, Buca capitalized payments totaling approximately $572,000 made to an independent contractor who obtained permits for Buca's restaurants, despite having no proper accounting basis to do so. The invoices from this independent contractor, which consisted of e-mails listing Buca restaurants that needed

9

assistance in obtaining permits, contained no itemization of her time or work. The contractor's work mainly concerned the ongoing operations of Buca's restaurants, which should not be capitalized.

28. A group of Buca's senior accounting personnel, including the assistant controller, the tax director, and Skrypek, met with Gadel in June 2003 to confront him about some of the accounting abuses identified above. When questioned about the capitalization of expenses, Gadel acknowledged that some of his accounting methods were aggressive, but denied any wrongdoing. When asked specifically about relationships with vendors like High Wire and EDP, Gadel responded that no problems with these relationships existed. Neither Gadel nor Skrypek took any remedial action based on the issues raised at the meeting.

<u>Effect On Buca's Income</u>

29. After conducting an internal investigation, Buca restated its financial statements for the 2000 to 2003 fiscal years and for the first three quarters of fiscal 2004. In its 2004 10-K, filed on July 25, 2005, Buca disclosed that, because of the improper capitalization, it had overstated its pre-tax income by approximately $11.9 million for the fiscal years 2000 through 2003 and the first three quarters of fiscal 2004. The improper capitalization inflated Buca's reported pre-tax annual income from 2000 to 2003 in amounts ranging from 18.8% to 36.9%.

30. The improper capitalization of expenses had a material impact on Buca's reported pre-tax income, as illustrated in the table below:

|  | Fiscal Year | | | |
| --- | --- | --- | --- | --- |
| (Numbers in 1000s) | 2000 | 2001 | 2002 | 2003 |
| Reported Income (Loss), Pre-Tax | 11,206 | 10,655 | 12,545 | (16,341) |
| Impact on Pre-Tax Income (Loss) of Improper Capitalization of Expenses | 2,106 | 3,934 | 2,796 | 3,828 |
| **Improper Capitalization as a Percentage of Pre-Tax Income (Loss)** | 18.8% | 36.9% | 22.3% | 23.4% |

## COUNT I

**Violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)]**

31. Paragraphs 1 through 30 are realleged and incorporated by reference as set forth fully herein.

32. At the times alleged in this Complaint, Buca, in the offer and sale of securities, by the use of the means and instruments of transportation and communication in interstate commerce and by the use of the mails, directly and indirectly, has employed devices, schemes and artifices to defraud.

33. Buca filed several S-3 and S-8 registration statements with the Commission in connection with the offerings of its securities. These registration statements incorporated by reference Buca's financial statements and other Commission filings.

34. In the offer and sale of securities and as part of the scheme to defraud, Buca made untrue statements of material fact and omitted to state material facts to investors and prospective investors regarding the executive compensation of its CEO and CFO, and their involvement in related-party transactions, as more fully described above.

35. Buca knew or was reckless in not knowing of the facts and circumstances described above.

36. By reason of the activities described above, Buca violated Section 17(a) of the Securities Act.

## COUNT II

### Violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] Promulgated Thereunder

37. Paragraphs 1 through 30 are realleged and incorporated by reference as set forth fully herein.

38. At the times alleged in the Complaint, Buca, in connection with the purchase and sale of securities described above, by the use of the means and instrumentalities of interstate commerce and of the mails, directly and indirectly, has employed devices, schemes, and artifices to defraud; has made untrue statements of material fact and has omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and has engaged in acts, practices, and courses of business which have operated and will operate as a fraud and deceit upon purchasers and sellers of such securities, all as more fully described above.

39. Buca knew or was reckless in not knowing of the activities described above.

40. By reason of the activities described above, Buca violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT III

**Violations of Section 14(a) of the Exchange Act [15 U.S.C. § 78n] and Rules 14a-3 and 14a-9 [17 C.F.R. 240.14a-3 and 240.14a-9] Promulgated Thereunder**

41. Paragraphs 1 through 30 are realleged and incorporated by reference as set forth fully herein.

42. Section 14(a) of the Exchange Act requires registrants that solicit any proxy or consent or authorization in connection with any security registered pursuant to Section 12 of the Exchange Act (other than an exempted security), to comply with such rules as the Commission may promulgate. Rule 14a-3 provides that no solicitation of a proxy may occur unless each person solicited is concurrently furnished or has previously been furnished with a proxy statement containing the information specified in Schedule 14A. Rule 14a-9 prohibits, among other things, the use of proxy statements which omit to state any material fact necessary in order to make the statements therein not false or misleading.

43. Buca filed proxy statements for the years 2001 through 2003 that materially understated its CEO's and CFO's compensation and omitted disclosure of related party transactions involving them, discussed in greater detail above.

44. By reason of the activities described above, Buca violated Section 14(a) of the Exchange Act and Rules 14a-3 and 14a-9 thereunder.

## COUNT IV

**Violations of Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20, 13a-1, and 13a-13 [17 C.F.R. 240.12b-20, 240.13a-1, and 240.13a-13] Promulgated Thereunder**

45. Paragraphs 1 through 30 are realleged and incorporated by reference as set forth fully herein.

46. As described above, Buca, an issuer of securities registered pursuant to Section 12 of the Exchange Act, through its scheme to manipulate earnings, materially misstated its revenue and net income on its books and records and in financial statements included in its periodic reports.

47. From the first quarter of 2000 to the third quarter of 2004, Buca filed with the Commission annual and quarterly reports on Form 10-K and Form 10-Q that were not in accordance with such rules and regulations that the Commission has prescribed as necessary and in the public interest and for the protection of investors and also failed to include in those reports such further material information as was necessary to make the required statements made therein, in light of the circumstances under which they were made, not misleading.

48. By reason of the activities described above, Buca violated Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1, and 13a-13 thereunder.

## COUNT V

**Buca's violations of Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act**
**[15 U.S.C. § 78m(b)(2)(A)-(b)(2)(B)]**

49. Paragraphs 1 through 30 are realleged and incorporated by reference as set forth fully herein.

50. From January 2000 through at least September 2004, Buca failed to make and keep books, records, and accounts which in reasonable detail accurately and fairly reflected the transactions and dispositions of Buca's assets.

51. From January 2000 through at least September 2004, Buca failed to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that transactions were recorded as necessary to permit preparation of financial statements in

conformity with generally accepted accounting principles or any other criteria applicable to such statements.

52. By reason of the activities described above, Buca violated Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act.

## **PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully requests that the Court:

I.

Issue findings of fact and conclusions of law that Buca committed the violations charged and alleged herein.

II.

Issue an Order of Permanent Injunction restraining and enjoining Buca, its officers, agents, servants, employees and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the Order by personal service or otherwise, from, directly or indirectly, violating Sections 17(a) of the Securities Act [15 U.S.C. § 77q(a)]; Sections 10(b), 13(a), 13(b)(2)(A), 13(b)(2)(B), and 14(a) of the Exchange Act [15 U.S.C. §§ 78j(b), 78m(a), 78m(b)(2)(A), 78m(b)(2)(B), and 78n(a)] and Rules 10b-5, 12b-20, 13a-1, 13a-13, 14a-3, and 14a-9 thereunder [ 17 C.F.R. 240.10b-5,  17 C.F.R. 240.12b-20, 17 C.F.R.240.13a-1, 17 C.F.R.240.13a-13, 17 C.F.R. 240.14a-3, and 17 C.F.R. 240.14a-9].

III.

Retain jurisdiction of this action to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

IV.

Grant an Order for such further relief as the Court may deem necessary and appropriate.

Respectfully submitted,

s/ Christopher Shearer
John J. Sikora, Jr.
Anne C. McKinley
Christopher S. Shearer
Attorneys for Plaintiff
United States Securities and Exchange Commission
175 West Jackson Boulevard, Suite 900
Chicago, Illinois 60604
Telephone:  (312) 353-7390
Facsimile:  (312) 353-7398

DATED: September 27, 2007